UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JANICE ST. MARTHE,

                              Plaintiff,        **No. 6:15-cv-06436(MAT)**
                                                **DECISION AND ORDER**

              -vs-

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                              Defendant.

_____

## INTRODUCTION

Janice St. Marthe ("Plaintiff"), represented by counsel, brings this action pursuant to Titles II and XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Acting Commissioner of Social Security ("the Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c).

## PROCEDURAL STATUS

Plaintiff, a former nursing assistant at the Friendly Home and Monroe Community Hospital, protectively filed applications for DIB and SSI, alleging disability beginning on August 24, 2012, due to, _inter_ _alia_, bilateral knee pain, following three knee surgeries; shoulder pain, following right-shoulder injury and corrective surgery; and lower back pain. After the claims were denied, Plaintiff requested a hearing, which was held before administrative

law judge Michael W. Devlin ("the ALJ") on December 17, 2013, in Rochester, New York. Plaintiff appeared with her attorney and testified, as did an impartial vocational expert ("the VE").

The ALJ issued an unfavorable decision on March 28, 2014. The Appeals Council denied Plaintiff's request for review on May 29, 2015, making the ALJ's decision the decision of the Commissioner. This timely action followed.

Plaintiff filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, and Defendant filed a memorandum of law in opposition, also seeking judgment on the pleadings. For the reasons that follow, the Commissioner's decision is reversed, and the matter is remanded for further administrative proceedings.

## SUMMARY OF RELEVANT MEDICAL EVIDENCE

In July and August of 2005, Plaintiff treated with orthopedist Christopher Drinkwater, M.D. for persistent right medial knee pain. An MRI revealed mucoid degeneration affecting both menisci, with inner margin irregularity on the lateral meniscus; mild proximal thickening of the medial collateral ligament ("MCL"), likely related to prior trauma; joint effusion; a Baker's cyst; and prepatellar edema. Plaintiff presented to Dr. Drinkwater in August and September 2007, with continued right and left knee pain.

In July of 2008, Plaintiff slipped and fell at work, sustaining a right shoulder injury. An MRI in August 2008,

indicated a short full-thickness tear of the rotator cuff, involving the anterior supraspinatus; a severe partial tear involving the remaining substance of the supraspinatus tendon; a moderate partial tear involving the anterior supraspinatus tendon; fluid within the subdeltoid; and degenerative disease of the acromioclavicular joint, with narrowing of the subacromial space. Dr. Ilya Voloshin treated Plaintiff in August 2008, for right shoulder pain, worse with overhead activities, and occasional numbness and tingling. Dr. Voloshin found evidence of subacromial impingement syndrome.

On October 8, 2008, Plaintiff underwent a right Rotator cuff repair, right shoulder decompression, and right shoulder extensive glenohumeral debridement by Dr. Voloshin. Following this surgery, Plaintiff continued to experience right shoulder pain, weakness, and difficulty getting comfortable, which she reported to Nurse Practitioner Linda L. McHenry ("NP McHenry") and Dr. Voloshin at appointments in October and December 2008, and February, April, and May 2009.

Plaintiff sustained a new injury at work that resulted in right shoulder pain, extending to her neck, as well as patchy numbness. A June 2009 MRI revealed a large partial-thickness undersurface tear of the supraspinatus of the right shoulder. At this point, her work restrictions remained as follows: no lifting,

pushing, or pulling greater than 10 pounds, and no pushing or pulling wheelchairs.

On July 31, 2009, an MRI of Plaintiff's left knee revealed a complex tear of the posterior horn of the medial meniscus, progressed over 2 years; an interval tear of the posterior horn and body of the lateral meniscus, extending to both surfaces; cartilage thinning in the medial and lateral compartments; small joint effusion; and a Baker's cyst. Plaintiff subsequently underwent a left knee arthroscopy, performed by Dr. Drinkwater. She was placed on complete disability.

In September 2009, at a post-surgery follow-up appointment with Dr. Drinkwater, Plaintiff reported knee pain extending down into her calf. In October 2009, Plaintiff complained of continued pain and stiffness in that knee. Dr. Drinkwater observed that Plaintiff was making slow progress following her surgery, and stated that she could not return to work.

Also in August 2009, Plaintiff returned to see Dr. Voloshin with complaints of right shoulder pain when lifting objects overhead. She was told to continue her work restrictions, which included avoidance of overhead lifting and not lifting anything heavier than 20 pounds. In October 2009, Plaintiff reported weakness in her right shoulder; Dr. Voloshin noticed decreased strength in the shoulder on examination. Plaintiff had a permanent work restriction of no lifting over 25 pounds.

In January 2011, Plaintiff was treated by Dr. Stephen Lurie for headaches, nausea upon lying supine, early satiety, decreased appetite, occasional vomiting, sinus pain, loss of voice, and sore throat. She reported ongoing mild pain in her back and shoulders. Dr. Lurie diagnosed Plaintiff with acid reflux and shoulder pain.

In June 2011, Plaintiff reported to NP Rodenberg that she was having increased left knee pain. An x-ray revealed a trace of joint effusion, indicative of mild osteoarthritis. She received a cortisone injection.

On August 15, 2011, Plaintiff fell at work and hit her left knee. At the urgent care clinic, she was diagnosed with a sprain/strain of her left knee/leg. She was told to limit her walking, kneeling and standing at work to 4 to 6 hours per day, for 2 weeks. On August 16, 2011, Plaintiff reported to Dr. Drinkwater that she had swelling and burning in her left knee and increased pain, was hardly able to walk, and was using a cane. Dr. Drinkwater assessed internal derangement of the left knee. Later in August 2011, Dr. Drinkwater observed ongoing effusion in the left knee. An MRI of the left knee on August 24, 2011, showed an interval change in the appearance of the posterior horn and body of the medial meniscus, more likely related to prior partial menisectomy and less likely related to re-tear; a suspected tear of the posterior horn of the lateral meniscus; small joint effusion; and a Baker's cyst.

On September 12, 2011, Dr. Drinkwater performed a left knee arthroscopy, partial medial meniscectomy, chondroplasty of the medial femoral condyle, and minor debridement of the lateral compartment on Plaintiff. Plaintiff followed up with Dr. Drinkwater in late September and early October, at which time she was 100 percent disabled. In early November, her disability status for worker's compensation was 25 percent. However, she had ongoing pain and was administered a cortisone injection.

In late December 2011, Plaintiff returned to see Dr. Drinkwater, complaining of right knee pain in the posterior and posterolateral aspects, as well as catching, locking, and swelling of that joint. On examination, she walked with a limp and stiff knee compartment. Dr. Drinkwater observed a grade I effusion and mild lateral instability in the knee. The diagnosis was internal derangement of the knee. She remained at 25 percent disability. An MRI performed of Plaintiff's right knee on December 27, 2011, revealed mild thickening of the proximal MCL, possibly representing sequelae to prior strain; abnormal intrasubstance signal in the medial meniscus body, compatible with mucoid degenerative change; vertical signal abnormality in the lateral meniscus anterior body, compatible with a small tear; degenerative articular cartilage abnormalities in the medial and lateral compartments; and a new fissure with cartilage heterogeneity in the patellofemoral compartment.

On April 3, 2012, Plaintiff returned to Dr. Drinkwater with continued bilateral knee pain, greater on the left than on the right. She reported feeling a "pop" in her left knee, and had experienced increased pain since then. On examination, there was trace effusion bilaterally and slightly antalgic gait on the left. Dr. Drinkwater assessed bilateral osteoarthritis of the knees and a 100-percent temporary impairment. A knee x-ray taken that day revealed mild medial compartment narrowing and tricompartmental osteophytes of the left knee, and similar degeneratives changes on the right.

Dr. Lurie saw Plaintiff at the end of April 2012. Her medications included terbinafine, ibuprofen, nexium, apple cider vinegar, vitamin D, and oxycodone. She reported that she was being followed by an orthopedist for her bilateral knee pain and that she was in a job retraining program in the hopes of obtaining work as a long-haul truck driver.

On May 3, 2012, Dr. Drinkwater administered Hyalgan injections to both of Plaintiff's knees. NP Rodenburg administered Hyalgan injections to both knees weekly for the remaining four weeks in May. Plaintiff reported increased pain in her right knee, and Dr. Drinkwater assessed a 25 percent disability. In June of 2012, Plaintiff noted severe right medial knee pain. She received two Hyalgan injections that month.

-7-

Also in early June, Plaintiff saw Dr. Lurie, complaining of bilateral knee pain and continued reflux symptoms. Dr. Lurie observed that Plaintiff had a slow, antalgic gait. He diagnosed reflux esophagitis and severe bilateral degenerative joint disease of the knees. He added a prescription for Meloxicam, a non-steroidal anti-inflammatory drug ("NSAID").

In late June of 2012, Plaintiff was treated by NP Bethany Merklinger for "dull" lower back pain, which was exacerbated by bending forwards and backwards, lifting, and pulling. The diagnosis was lumbago.

At the end of July of 2012, Plaintiff saw Dr. Lurie in follow-up for her chronic bilateral knee pain, secondary to Degenerative joint disease. She had undergone numerous Hyalgan and cortisone injections in both knees, which had not helped. Physical demands exacerbated the pain in both her knees. She continued on Meloxicam for pain management, and was administered Hyalgan injections bilaterally.

On September 6, 2012, Plaintiff was assessed by physical therapist Donald Brown ("PT Brown") in regards to her right shoulder. Her pain was 6 out of 10 at its best, and beyond 10 at its worst. She displayed very guarded mannerisms with any testing position and walked with an antalgic gait. Supraspinatus impingement and infraspinatus impingement tests were positive. The assessment was right shoulder pain consistent with Rotator cuff

strain in the setting of prior Rotator cuff repair. PT Brown opined that she was a good candidate for physical therapy.

Also on September 6, 2012, Plaintiff saw NP Rodenburg, complaining of pain at a 10 out of 10 in her left knee, worse since her last visit. NP Rodenburg observed crepitus and pain with range of motion. Plaintiff was given a cortisone injection that day.

At the end of October of 2012, Plaintiff returned to Dr. Voloshin, who had performed her shoulder surgery, complaining of increased pain in her shoulder with overhead activity, and discomfort at night. Dr. Voloshin noted that Plaintiff had reinjured her right shoulder at work on August 23, 2012. Tests for shoulder impingement were positive. Dr. Voloshin assessed right shoulder subacromial impingement syndrome and a possible recurrent Rotator cuff tear, and imposed work restrictions of no lifting overhead and no lifting of anything heavier than 10 pounds. A November 6, 2012 MRI of the right shoulder indicated moderate supraspinatus tendinopathy and a very small partial thickness undersurface tear at the supraspinatus tendon insertion, an old interstitial tear of the supraspinatus tendon, and mild degenerative changes.

On November 13, 2012, Plaintiff treated with Dr. Voloshin and reported some discomfort over the anterior and lateral aspects of her right shoulder. Tests for impingement were mildly positive. Dr. Voloshin diagnosed her with right shoulder subacromial

impingement syndrome and released her to full duty at work (she was employed as a nurse's assistant at that time).

Two days later, Plaintiff reported severe right knee pain to NP Rodenburg and requested a cortisone shot despite having had one 2 months previously.

Dr. Drinkwater performed a right knee arthroscopy on Plaintiff on January 14, 2013.

On January 16, 2013, Plaintiff was assessed by PT Ryan Eastman with regard to repetitive strain of her right knee. Plaintiff reported aching, sharp pain, with decreased range of motion, decreased strength, and pain at night. Her symptoms worsened if she attempted to ascend or descend stairs, and she used crutches. At its best, the pain was a 3 out of 10; at its worst, it was an 8 out of 10. PT Eastman noted her antalgic gait, tenderness at the medial and lateral joint line, and inability to straight-leg-raise independently.  Plaintiff had 7 more physical therapy appointments with PT Eastman; the last one was May 6, 2013.

Plaintiff returned to see Dr. Drinkwater on April 2, 2013, with regard to her right knee pain. On examination, she had diminished strength and pain with range of motion. The diagnosis was right knee osteoarthritis. When she saw Dr. Drinkwater again on July 2, 2013, her knee was tender to palpation and swollen, with diminished strength, and pain and crepitus with range of motion. She was given a cortisone injection.

At the end of July 2013, Plaintiff returned to Dr. Lurie with complains of worsening pain in the subxiphoid area and knee pain. He diagnosed her with Degenerative joint disease of the knee and prescribed Tramadol for pain.

Plaintiff saw NP Rodenburg on September 19, 2013, for her right knee pain. Intraoperative findings by Dr. Drinkwater included grade III medial compartment changes, grade I lateral compartment changes, and grade II patellofemoral changes. The diagnosis was moderate osteoarthritis, and Plaintiff was unable to work at her job as a nursing assistant.

On October 4, 2013, Plaintiff was treated by Dr. Lurie for crampy, "grabbing" pain in her midline lumbar spine, which worsened upon bending and lifting. She was still taking Tramadol for pain and omeprazole for emesis. Dr. Lurie's diagnoses were lumbago and chronic reflux esophagitis. She returned to see Dr. Lurie on November 8, 2013, with continued back and right knee pain, and headaches. Her gait was slow and antalgic. Dr. Lurie issued diagnoses of lumbago and chronic knee pain.

**THE ALJ'S DECISION**

Applying the Commissioner's five-step sequential evaluation for adjudicating disability claims, see 20 C.F.R. §§ 404.1520, 416.920, the ALJ found, at step one, that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. At step two, the ALJ found Plaintiff has the "severe" impairments of

bilateral knee osteoarthritis, status post-right shoulder injury and surgery, lumbago, and obesity. T.14.[1] The ALJ found at step three that Plaintiff does not have an impairment, or combination of impairments, that meets or equals a listed impairment. In particular, the ALJ considered Listings 1.02 and 1.04 under Listing 1.00 (Musculoskeletal System). Next, the ALJ assessed Plaintiff with the residual functional capacity ("RFC") to perform light work as defined in the regulations, with the following limitations: She can sit for about 6 hours in an 8-hour day; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; and frequently reach and handle with her dominant right upper extremity. T.14-19. At step four, the ALJ found that Plaintiff, who was 53 years-old, and thus closely approaching advanced age on the disability onset date, could not perform her past relevant work as a nurse's assistant. T.19. Proceeding to step five, the ALJ relied on the VE's testimony to find that Plaintiff could perform jobs that exist in significant numbers in the national economy, such as housekeeper cleaner and counter clerk. T.19-20. Accordingly, the ALJ entered a finding of not disabled.

---

[1]

Numbers preceded by "T." refer to pages from the administrative transcript, submitted by Defendant as a separately bound exhibit.

**SCOPE OF REVIEW**

When considering a claimant's challenge to the decision of the Commissioner denying benefits under the Act, the district court is limited to determining whether the Commissioner's findings were supported by substantial record evidence and whether the Commissioner employed the proper legal standards. Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003). The district court must accept the Commissioner's findings of fact, provided that such findings are supported by "substantial evidence" in the record. See 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive"). The court nevertheless must scrutinize the whole record and examine evidence that supports or detracts from both sides. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted). "The deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003) (citing Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)).

**DISCUSSION**

**I.   Failure to Adequately Consider Plaintiff's Obesity**

Plaintiff contends that remand is appropriate because, after finding obesity[2] to be a severe impairment at step two, the ALJ did

---

[2] In November 2013, Plaintiff weighed 253 pounds, and had a body mass index ("BMI") of 37.43. T.476. This is considered "Level II" obesity by the National Institutes of Health. See Pl's Mem. at 20 & n. 3 (citing Clinical Guidelines on

not discuss this impairment during the remainder of the sequential evaluation.   According to Titles II & XVI: Evaluation of Obesity, Social Security Ruling ("SSR") 02-01P, 2002 WL 34686281 (S.S.A. Sept. 12, 2002), the Commissioner has recognized that "[i]ndividuals with obesity may have problems with the ability to sustain a function over time," and therefore decisionmakers are required to consider obesity at multiple stages of the sequential evaluation, including when determining whether "[t]he individual's impairment(s) prevents him or her from doing past relevant work and other work that exists in significant numbers in the national economy." 2002 WL 34686281, at *6.

Plaintiff contends that her obesity amplifies the functional limitations caused by the knee impairment. See SSR 00-3P, 2000 WL 33952015, at *5 ("The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone. . . ."). Plaintiff's orthopedic surgeon recommended she lose weight in order to decrease the mechanical load on her knees, T.448, which indicates that her obesity would affect her ability to stand and walk, particularly when coupled with her bilateral knee osteoarthritis and status

---

the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults (NIH Publication No. 98-4083, Sept. 1998); National Heart, Lung and Blood Institute Body Mass Index calculator, available at http://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm)).

post-three knee surgeries. However, the only indication that the ALJ took Plaintiff's obesity into account during the sequential evaluation is his self-serving comment, at step two, that he "adequately considered" SSR 02-1p regarding Plaintiff's obesity, "both singly and in combination with [her] underlying impairments." However, this conclusory statement does not comport with SSR 02-01P. See SSR 02-1P, 2002 WL 34686281, at *7 ("As with any other impairment, *we will explain* how we reached our conclusions on whether obesity caused any physical or mental limitations.") (emphasis supplied). The Court finds that this was error. See, e.g., Cornell v. Astrue, 764 F. Supp.2d 381, 405 (N.D.N.Y. 2010) (remanding where "the ALJ neither recognized the combined effect of obesity with plaintiff's other impairments, nor considered her obesity in conjunction with his RFC analysis" in violation of SSR 02-01P's directive to "evaluate obesity in conjunction with claimant's RFC by assessing the 'effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment'") (quotation and citations omitted).

## II.  Failure to Properly Weigh Treating Physicians' Opinions

Plaintiff contends that the ALJ failed to accord the proper weight to the opinions offered by two of her treating physicians, Dr. Drinkwater and Dr. Lurie. See T.317-20; 470-73. Plaintiff further argues that the ALJ failed to give "good reasons" for

-15-

discounting them, contrary to his obligations under the regulatory framework.

## 1. Legal Principles

"[T]he treating physician rule generally requires deference to the medical opinion of a claimant's treating physician[.]" <u>Halloran v. Barnhart</u>, 362 F.3d 28, 32 (2d Cir. 2004) (<u>per curiam</u>) (internal and other citations omitted). A corollary to the treating physician rule is the so-called "good reasons rule," which is based on the regulations specifying that "the Commissioner 'will always give good reasons'" for the weight given to a treating source opinion. <u>Halloran</u>, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(d)(2); citing 20 C.F.R. § 416.927(d)(2); citation omitted). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific . . . .'" <u>Blakely v. Commissioner of Social Sec.</u>, 581 F.3d 399, 406 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. July 2, 1996)). The "good reasons" rule exists to "ensur[e] that each denied claimant receives fair process[.]" <u>Rogers v. Commissioner of Social Sec.</u>, 486 F.3d 234, 243 (6th Cir. 2007). Accordingly, an ALJ's "'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence*, even where the conclusion of the ALJ may be justified based on the

record[,]'" Blakely, 581 F.3d at 407 (quotation omitted; emphasis in original).

Where controlling weight is not accorded to a treating physician's opinion, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion[,]" id. (quoting 20 C.F.R. § 404.1527(d)(2)), such as "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.'" Id. (quoting 20 C.F.R. § 404.1527(d)(2)).

## 2. Dr. Drinkwater's Opinion

On September 28, 2012, Dr. Drinkwater completed a physical RFC questionnaire on Plaintiff's behalf. Dr. Drinkwater began treating Plaintiff in 2005, and performed all three of her knee surgeries. By the time he issued his RFC questionnaire in September 2012, their treating relationship spanned seven years. There is no doubt that Dr. Drinkwater qualifies as a "treating physician" given the length and depth of his treatment relationship with Plaintiff, and the Commissioner does not dispute this point. See Arnone v. Bowen, 882 F.2d 34, 41 (2d Cir. 1989) ("Whether the 'treating physician'

rule is appropriately applied depends on "the nature of the ongoing physician-treatment relationship.") (quotation omitted).

In the RFC questionnaire, Dr. Drinkwater diagnosed Plaintiff with bilateral knee osteoarthritis and opined that her prognosis was good to fair. Her symptoms included pain bilaterally in her knees with any prolonged standing. Her impairments were expected to last at least 12 months and were reasonably consistent with the symptoms and functional limitations described. Furthermore, Dr. Drinkwater opined that Plaintiff's symptoms were severe enough to constantly interfere with the attention and concentration needed to perform simple work tasks. T.318. Dr. Drinkwater indicated that Plaintiff was able to tolerate moderate work stress. With regard to specific functional limitations, Dr. Drinkwater concluded that Plaintiff was able to sit for 30 minutes before needing to get up; stand for 10 minutes before needing to sit down; stand or walk less than 2 hours in an 8-hour workday; and sit for about 2 hours in an 8-hour workday. In addition, Plaintiff required periods of time to walk around during an 8-hour work day and needed to take unscheduled breaks during the workday. T.318-19. Dr. Drinkwater stated that Plaintiff could not walk any distance without pain, was to never carry or lift anything greater than 20 pounds, and rarely could lift less than 10 pounds. T.319. She was never to twist, stoop, crouch/squat, climb ladders, or climb stairs. Plaintiff's

impairments would cause good days and bad days, and would cause her to be absent from work more than 4 days per month. T.320.

Though the ALJ purported to assign Dr. Drinkwater's opinion "some weight," he nevertheless formulated an RFC that conflicted with Dr. Drinkwater's limitations on Plaintiff's ability to sit, stand and walk. T.14. The ALJ discounted Dr. Drinkwater's opinion on the basis that it was "somewhat inconsistent with his treatment notes, including his ongoing assessments of [Plaintiff]'s disability status." T.17.

The ALJ's mention of Plaintiff's "disability status" refers to assessments Dr. Drinkwater made in regards to her worker's compensation claim, namely, that she had a 15- to 20-percent loss-of-use of her right and left knees. T.17-18. The ALJ concluded that these loss-of-use percentages "[did] not comport with residual limitations or an impairment that would be considered totally disabling." T.18. The Court finds that this is not a "good reason" for discounting Dr. Drinkwater's opinion. As an initial matter, "there are different statutory tests for disability under worker's compensation statutes and under the Social Security Act." Coria v. Heckler, 750 F.2d 245, 247 (3d Cir. 1984) (noting differences between Social Security disability insurance and worker's compensation benefits, including that Social Security disability determinations "are not geared to a percentage of disability, as are worker's compensation disability conclusions") (citation

-19-

omitted).   Therefore,  as  Plaintiff  argues,  the  loss-of-use
percentages assessed by Dr. Drinkwater for purposes of her worker's
compensation  claim  give  no  indication  as  to  how  a  particular
percentage  of  loss  would  affect  her  functional  limitations  and
abilities  in  the  context  of  being  able  to  perform  work-related
activities  to  the  extent  required  in  order  to  sustain  full-time
gainful  employment  in  the  competitive  workplace.  For  example,
Dr. Drinkwater assessed a 20 percent loss-of-use in Plaintiff's
right lower extremity on September 6, 2012; about a month later, on
October 24, 2012, he assessed a 20 percent loss-of-use in her left
lower extremity. The loss-of-use percentages provide no information
regarding how a 20-percent loss in a single lower extremity would
affect Plaintiff's abilities to perform the exertional and postural
requirements of full-time gainful employment, much less how a
20-percent loss in *both* lower extremities would affect these same
abilities.  In  short,  there  is  no  equivalency  between  Social
Security standards and worker's compensation guidelines, and the
loss-of-use  percentages  are  simply  too  vague  to  constitute
substantial evidence for rejecting Dr. Drinkwater's opinion.

The  ALJ  did  not  point  to  any  other  evidence  to  support  his
contention  that  Dr.  Drinkwater's  opinion  was  "somewhat"
inconsistent with his treatment notes. By failing to identify the
alleged inconsistencies between Dr. Drinkwater's RFC questionnaire
and the 7 years of treatment notes, the ALJ has failed to provide

any basis for rejecting Dr. Drinkwater's opinion, much less the
requisite "good reasons" based on substantial evidence. See, e.g.,
Ely v. Colvin, No. 14-CV-6641P, 2016 WL 315980, at *4 (W.D.N.Y.
Jan. 27, 2016) ("The ALJ does not identify anything in the record,
other than the GAF scores, discussed below, that is inconsistent
with [the treating doctor]'s opinions. Without identifying the
alleged inconsistencies in the record, the ALJ has failed to
provide any basis for rejecting [those] opinions.") (citing Ashley
v. Comm'r of Soc. Sec., No. 5:14-CV-00040, 2014 WL 7409594, at *2
(N.D.N.Y. 2014) (ALJ's "conclusory statement" that the "treating
records did not support [the treating source]'s conclusion"
"fail[ed] to fulfill the heightened duty of explanation" required
by the treating physician rule); other citations omitted). As
Plaintiff notes, a review of the record indicates that
Dr. Drinkwater's opinion is consistent with her history of
treatment, which became increasingly aggressive following her
failure at conservative treatment modalities. For instance,
Plaintiff underwent three knee surgeries, including arthroscopy on
both knees. Prior to the most recent surgery in January 2013, a
right knee arthroscopy, Plaintiff had received repeated cortisone
and Hyalgan injections which did not provide relief. Less than four
months later, on April 2, 2013, she returned to Dr. Drinkwater
complaining of right knee pain, with tenderness to palpation,
swelling, crepitus, and diminished strength; Dr. Drinkwater

administered a cortisone injection. Not only is Dr. Drinkwater's opinion consistent with his notes documenting his extensive treatment history of Plaintiff, the notes themselves contradict the ALJ's characterization of Plaintiff's therapeutic course as "essentially routine and/or conservative in nature." Three surgeries (two of which were on the same weight-bearing joint) and repeated cortisone and Hyalgan injections, in addition to physical therapy and various opioid and NSAID pain medications, hardly constitute "routine and/or conservative" treatment for knee pain. A reason, such as this, which relies on a mischaracterization of the record, cannot constitute a "good reason" for rejecting a treating physician's opinion. See, e.g., Malave v. Sullivan, 777 F. Supp. 247, 253 (S.D.N.Y. 1991) ("One stated reason for the ALJ's rejection of the treating physician's opinion is an apparent misreading of the record. . . . [T]o the extent that the ALJ's decision to reject the treating physician's determination of disability rested on this stated reason, that rejection is not supported by substantial evidence in the record.").

The Commissioner has attempted to justify the ALJ's application of the treating physician rule by offering new reasons, not considered by the ALJ in rendering his decision. For instance, the Commissioner argues that Plaintiff's description of her own activities, e.g., her participation in a job retraining program, undermines Dr. Drinkwater's imposition of disabling limitations.

The Commissioner also urges that in October 2013, Plaintiff was still working as a home health aide despite pain on lifting and bending, which exceeded the restrictions assessed by Dr. Drinkwater in September 2012. However, no such explicit findings were made by the ALJ, and this Court is not permitted to accept the Commissioner's post-hoc rationalizations for the ALJ's determination. See, e.g., Petersen v. Astrue, 2 F. Supp.3d 223, 234 (N.D.N.Y. 2012) ("[T]his Court may not 'create post-hoc rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apparent from the Commissioner's decision itself.'") (quotation omitted; citing, inter alia, Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) ("Nor may [the Court] properly affirm an administrative action on grounds different from those considered by the agency.")). The ALJ's brief discussion of Dr. Drinkwater's opinion "fails to clearly identify any significant deficits" with it or to address the required factors set forth by 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6). See, e.g., Ashley, 2014 WL 7409594, at *3 (finding that the ALJ's "single, short and conclusory paragraph fails to clearly identify any significant deficits with [the treating physician]'s opinion or to address the required factors set forth by 20 C.F.R. § 404.1527(c)(1)-(6)"; this constituted error requiring remand) (citations omitted).

### 3.   Dr. Lurie's Opinion

On November 14, 2013, Dr. Lurie completed a physical RFC questionnaire on Plaintiff's behalf. Dr. Lurie, who had treated Plaintiff since June of 2012, clearly qualifies as a treating source, and the Commissioner does not dispute this point. Dr. Lurie diagnosed Plaintiff with knee pain and opined she had a poor prognosis, given the failure of various NSAIDs to control her pain and a recent arthroscopic surgery. Dr. Lurie noted Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations, and symptoms or pain would cause constant interference with attention and concentration to perform simple work tasks. T.471. He concluded Plaintiff was capable of low stress jobs. Dr. Lurie also concluded she was not able to walk without severe pain. T.472. As far as specific limitations, Dr. Lurie opined that Plaintiff was able to sit for 45 minutes before needing to get up; stand for 5 minutes before needing to sit down; and stand or walk less than 2 hours in an 8-hour workday. In addition, she needed periods of walking around during an 8-hour workday, approximately 5 times each day for 3 minutes each time; needed a job that permitted shifting at will from sitting, standing, or walking; and needed unscheduled breaks during an 8-hour workday. T.472. Dr. Lurie restricted Plaintiff from lifting or carrying any amount of weight, and stated she was rarely able to twist; and was not able to stoop, bend, crouch/squat, or climb ladders or stairs.

-24-

Dr. Lurie indicated that Plaintiff's impairments would cause good days and bad days and would cause her to miss work more than four days per month of work. T.473.

The ALJ gave Dr. Lurie's opinion only "some weight," describing it as only "partially consistent" with treatment records and viewing it as improperly "advocating on behalf of the claimant, who is his long time patient." T.18. As he did when analyzing Dr. Drinkwater's opinion, the ALJ failed to specify any of the alleged conflicts he saw between Dr. Lurie's opinion and the treatment records. See, e.g., Ely, 2016 WL 315980, at *4 (citations omitted). This omission prevents the Court from conducting a meaningful review of the substantiality of the evidence supporting the ALJ's decision.

The other reason cited by the ALJ—that Dr. Lurie appeared to be "advocating" for Plaintiff, his "long time patient"—is not a "good reason" for discounting his opinion. See, e.g., Goldthrite v. Astrue, 535 F. Supp. 2d 329, 336 (W.D.N.Y. 2008) ("[T]hat a doctor 'naturally advocates his patient's cause is not a good reason to reject his opinion as a treating physician.'") (quoting McGoffin v. Barnhart, 288 F.3d 1248, 1253 (10th Cir. 2002) (citing Frey v. Bowen, 816 F.2d 508, 515 (10th Cir. 1987)). Moreover, it ignores the Commissioner's regulations embodying the principle that a medical source who has an ongoing therapeutic relationship with a claimant is better equipped to give an opinion as to a claimant's

functional limitations. See, e.g., 20 C.F.R. § 404.1527(c)(2)(ii) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.").

Again, the Commissioner has put forward arguments to justify the ALJ's decision to discount Dr. Lurie's RFC questionnaire. For instance, the Commissioner asserts that Dr. Lurie's assessed limitations were not consistent with her actual abilities, the doctors' progress reports, and a physical therapist's note. See Def's Mem., pp. 16-17 (citations to record omitted). However, as with Dr. Drinkwater, the rationales suggested by the Commissioner were not actually relied upon by the ALJ. This is improper, as discussed above. See, e.g., Balodis v. Leavitt, 704 F. Supp.2d 255, 267-68 (E.D.N.Y. 2010) ("Defendant points to other evidence in the record that might have supported the ALJ's rejection of Dr. Goldman's opinion. . . . However, none of these points was made by the ALJ; rather, the defendant is assuming that these were the factors that the ALJ had in mind in refusing to give Dr. Goldman's opinion controlling weight. Such assumptions are insufficient as a matter of law to bolster the ALJ's decision.")

(citing <u>Newbury v. Astrue</u>, 321 F. App'x 16, 18 (2d Cir. 2009) ("A reviewing court 'may not accept appellate counsel's <u>post hoc</u> rationalizations for agency action.'") (quotation omitted)).

Because the "[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand[,]" <u>Snell v. Apfel</u>, 177 F.3d 128, 133 (2d Cir. 1999), this case must be remanded. <u>See</u>, <u>e.g.</u>, <u>Richardson v. Barnhart</u>, 443 F. Supp.2d 411, 424-25 (W.D.N.Y. 2006) (remanding for a second time where the ALJ's decision "did not give good reasons, supported by substantial evidence, for failing to assign controlling weight to the opinion of a treating source").

**III. The Consultative Physician's Report is Not "Substantial Evidence" to Support RFC Determination**

With the treating physicians' opinions discounted by the ALJ, the only medical expert opinion remaining is that offered by consultative physician Samuel Balderman, M.D., to which the ALJ assigned "significant" weight. T.17. Plaintiff argues that in light of her further extensive treatment following Dr. Balderman's examination and report, his opinion was stale by the time of the ALJ's determination. Three months after Dr. Balderman's examination, Plaintiff underwent arthroscopy and a partial medial and lateral meniscectomy on her right knee, T.369, due to what Dr. Drinkwater described as "severe pain in the joint which is refractory to non-surgical means of treatment and is also causing debilitating loss of function and disruption of satisfactory

lifestyle." Id. Dr. Balderman's opinion is also too vague to constitute substantial evidence, insofar as he assessed "mild" limitation in reaching, pushing, and pulling due to right shoulder pain, and "mild" limitation in kneeling and climbing due to right knee pain. T.324. See Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010) ("To demonstrate that Plaintiff was capable of light to sedentary work, the ALJ points to Dr. Park's statement that Plaintiff had 'limitations of a mild degree of lifting, bending, walking, standing, and pushing and pulling on arm controls.' This vague statement cannot serve as an adequate basis for determining Plaintiff's RFC.") (citing Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000) (The consultative physician's "use of the terms 'moderate' and 'mild,' without additional information, does not permit the ALJ, a layperson notwithstanding her considerable and constant exposure to medical evidence, to make the necessary inference that [the claimant] can perform the exertional requirements of sedentary work.") (citation omitted); see also Bartrum v. Astrue, 32 F. Supp.3d 320, 331 (N.D.N.Y. 2012) (consultative examiner's report was not sufficient to override treating physician opinion, where it "assessed no gross limitation as to sitting, standing, or walking; and a 'mild to moderate' limitation as to lifting, carrying, pushing, and pulling; and was rendered a year before treating physician's most recent assessment) (citations omitted). Dr. Balderman's opinion also appears to be

incomplete, since he did not rate Plaintiff's limitations in regard to several significant work-related activities in "light" work, namely, sitting, standing, and walking. Thus, the ALJ did not have any opinion evidence from a medical expert to support key findings in his RFC assessment. This was error. See Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) ("In the absence of a medical opinion to support the ALJ's finding as to [the claimant]'s ability to perform sedentary work, it is well-settled that 'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. . . .") (citations omitted). This left the ALJ in the untenable position of interpreting raw medical data to arrive at an RFC determination, without the benefit of an expert medical opinion. Tomford v. Commissioner of Soc. Sec., No. 13-11140, 2014 WL 764685, at *16 (E.D. Mich. Feb. 25, 2014); see also Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (stating that "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion").

## IV.  Remedy

The fourth sentence of Section 405(g) of the Act provides that a "[c]ourt shall have power to enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner. . . , with or without remanding the case for a rehearing." 42 U.S.C. § 405(g). Because the ALJ misapplied several legal standards and because his finding as to Plaintiff's RFC is not supported by substantial evidence in the record, remand is warranted. E.g.,

-29-

LoRusso v. Astrue, No. 08 CV 3467(RJD), 2010 WL 1292300, at *7 (E.D.N.Y. Mar. 31, 2010). The only remaining issue is whether the matter should be remanded to permit the Commissioner another opportunity to determine Plaintiff's claim, or whether the Court should order the calculation and payment of benefits. The Court notes that the record is complete, and that there are two opinions from treating sources; these are two factors that weigh in favor of simply remanding for the payment of benefits. However, as noted above, the Commissioner has pointed to evidence in the record that might have supported the ALJ's rejection of Drs. Drinkwater's and Lurie's opinions, such as Plaintiff's own testimony concerning her abilities and limitations, the doctors' treatment notes, and her participation in vocational retraining. Plaintiff's attorney did not file a reply and thus the Court does not have the benefit of his response to these arguments. Thus, while basic principles of administrative law preclude the Court from accepting the Commissioner's after-the-fact arguments, the Court cannot make Plaintiff's attorney's arguments for him. Accordingly, the Court finds that the case must be remanded to the Commissioner for further proceedings consistent with this opinion. See, e.g., LoRusso, 2010 WL 1292300, at *8 (E.D.N.Y. Mar. 31, 2010)

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied, and Plaintiff's motion for

judgment on the pleadings is granted to the extent that the Commissioner's decision is reversed, and the matter is remanded for further administrative proceedings consistent with this Decision and Order. In particular, the ALJ is directed to explicitly consider Plaintiff's obesity when formulating his RFC assessment. In addition, the ALJ is directed to (1) re-evaluate Dr. Drinkwater's treating source opinion and, if the ALJ elects not to accord it controlling weight, give "good reasons" in accordance with the regulations for the decision not to assign it controlling weight; (2) re-evaluate Dr. Lurie's treating source opinion and, if the ALJ elects not to accord it controlling weight, give "good reasons" in accordance with the regulations for the decision not to assign it controlling weight; (3) if the ALJ does not give controlling weight to the treating physicians' opinions, he cannot rely on the stale, incomplete and vague report of Dr. Balderman, and therefore must obtain an updated and complete report from a consultative physician; and (4) re-assess Plaintiff's RFC as necessary in light of the foregoing re-evaluations.

**SO ORDERED.**

S/Michael A. Telesca

_____
     HON. MICHAEL A. TELESCA
     United States District Judge

Dated:     June 28, 2016
           Rochester, New York.